IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KERRY PICKARD, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) <br> _____) | Case No. 18-2372-JWL |

# **MEMORANDUM AND ORDER**

This matter comes before the Court on defendant's motion to strike plaintiffs' expert and for summary judgment (Doc. # 71). The motion is **denied in part and remains pending in part**. The summary judgment motion is denied to the extent based on the issue of causation. The Court retains under advisement the motion to strike and the summary judgment motion to the extent based on a ruling on the motion to strike. The Court will conduct an evidentiary hearing on the motion to strike on **December 7, 2020, at 1:00 p.m. CST, by videoconference**.[1]

---

[1] The details of the videoconference will be set by separate order. Any objection to conducting this hearing by videoconference must be filed by December 2, 2020.

I.   **Motion to Strike**

Plaintiffs assert wrongful death, survival, and lost-chance-of-survival claims under Kansas law, based on their allegation that personnel at a VA medical center committed medical malpractice in treating decedent John Cedar on January 18, 2017. Plaintiffs have designated Dr. Joel Bartfield, an emergency medicine physician, as an expert to testify that defendant breached the applicable standard of care. Defendant moves to strike Dr. Bartfield as an expert.

Defendant argues that Dr. Bartfield is not qualified to testify as an expert in this case because he does not meet the qualifying standard set forth in K.S.A. § 60-3412. That statute provides as follows:

> In any medical malpractice liability action . . ., in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed.

*See id.* Plaintiffs do not dispute that Section 60-3412 applies and that Dr. Bartfield may not offer his expert testimony unless 50 percent of his professional time was devoted to "actual clinical practice" during the relevant time period.[2]

---

[2] Although neither party has cited the rule, Fed. R. Evid. 601 provides that "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." *See id.*; *see also, e.g.*, *Latshaw v. Mt. Carmel Hosp.*, 52 F. Supp. 2d 1133, 1139 (D. Kan. 1999) (under Rule 601, compliance with K.S.A. § 60-3412 was required for standard-of-care expert in medical malpractice action under Kansas law). The parties agree that plaintiffs' malpractice claims in the present action are governed by the law of Kansas, in which the relevant conduct took place.

Kansas appellate courts have directly addressed this requirement that 50 percent of the expert's professional time have been devoted to "actual clinical practice" in only a handful of cases.  In *Endorf v. Bohlender*, 26 Kan. App. 2d 855 (2000), the Kansas Court of Appeals rejected a proposed definition of "actual clinical practice" under the statute that would encompass any medically-related activities other than as a professional witness, including teaching or administrative work or research without seeing any patients at all. *See id.* at 861.  The court considered the medical definitions of "clinical" and "practice", and it noted that the Kansas Legislature had in the past drawn distinctions between "clinical" on the one hand and "administrative", "educational", research", or "theoretical" on the other.  *See id.* at 862-63.  The court concluded as follows:

> "Actual clinical practice" means patient care.  However, patient care should not be limited to a physical presence or bedside requirement.  For example, here, [defendant] was criticized by [an expert] for failing to call Poison Control.  Had such a call been placed, the physician in Poison Control advising the emergency room doctor on patient care would be engaged in patient care and thus in actual clinical practice.  In this technological age of video teleconferencing, and the like, the practitioner of healing arts advising on, or addressing care for, a distant patient is engaged in actual clinical practice.

*See id.* at 865.

In *Dawson v. Prager*, 276 Kan. 373 (2003), the Kansas Supreme Court quoted with approval the preceding paragraph excerpted from *Endorf*.  *See id.* at 376 (quoting *Endorf*, 26 Kan. App. 2d at 865).  In *Schlaikjer v. Kaplan*, 296 Kan. 456 (2013), the Kansas Supreme Court adopted the *Endorf* definition as follows:

> Actual clinical practice means "patient care."  However, patient care is not limited to care delivered face-to-face or in the patient's physical presence.  It also includes "advising on" or "addressing" care for a patient;

3

each of these activities is encompassed within the definition of "actual clinical practice."

*See id.* at 468 (citing *Dawson*, 276 Kan. at 376).

Thus, under these cases, "active clinical practice" as used in Section 60-3412 means "patient care." Such care is not limited to direct patient care, in the sense that the practitioner is physically with a patient; it can also include indirect patient care, such as when the practitioner advises or consults to benefit a patient. Such care would not include purely administrative work or research or teaching that was not intended to benefit particular patients (whether or not the research or teaching could benefit unknown patients in the future). *See Utley v. Wray*, 2008 WL 11383462, at *5 (D. Kan. Apr. 24, 2008) ("actual clinical practice" did not include research that involved collecting data from patients without providing primary care or treatment to those patients).

At his deposition, Dr. Bartfield testified as follows concerning the breakdown of his professional time:

> Q      So beyond patient care do you have any administrative or teaching duties?
>
> A      Yes. So I'm the associate dean on graduate medical education. I oversee the residency programs and emergency medicine and all of our residency programs. We have forty-six, I believe, training programs, about four hundred residents and fellows. So I'm responsible for the accreditation involving those training programs and that's the major administrative role.
>
> Q      And then what about teaching duties?
>
> A      Well, I teach bedside, I teach when I am working in the emergency department. I do some, you know, I participate in conferences and whatnot, so that's mostly my teaching, educational extra that I deliver.

4

> Q      And what is your percentage of patient care versus your percentage of administrative duties?
>
> A      I work a day a week in the emergency department so I would say twenty percent patient care.
>
> Q      And how long have you had that kind of split with your work?
>
> A      Since 2002.
>
> Q      And so the rest of your time is spent, would it be appropriate to say eighty percent of your time is spent as an associate dean –
>
> A      Yes.
>
> Q      – or doing administrative work?
>
> A      Doing non-direct clinical work I think is probably the way of saying it.  You know, I have a number of national and regional things that I do within emergency medicine as well but one day a week, one day out of five I'm in the emergency department.
>
> . . .
>
> Q      . . . [Y]ou stated earlier that you see patients about one day a week.  And would it be appropriate to say that the other eighty percent of your practice was administrative duties?
>
> A      Oh, it's – everything, non-direct patient care, so administrative, teaching, advising, again, participating in administering examinations, writing board questions, lots of stuff.  I would say non-clinical is a lot easier than just calling it all administrative.  It's not all administrative.
>
> Q      Okay.  So it's your testimony that your non-clinical work takes up about eighty percent of your practice?
>
> A      Yes, that's right.
>
> Q      And that has been your standard since 2002?
>
> A      Yes.
>
> Q      Do you have any kind of resident supervision?  Do you supervise any residents?

5

      A      Yes.

      Q      Is that all the time, year-round, maybe that's a better way to ask?

      A      Year-round, yes.

      Q      And how much time does that take up?

      A      Well, I guess I need to know what you mean by supervise.  Do you mean supervise – well, it takes up all my time, frankly, almost everything that I do has to do with the supervision of residents or the training of residents in one way or another.  My clinical duties, you know, when I am in the emergency department I'm supervising residents in the care of patients for whom I'm the physician responsible, the physician of record.  So I guess it just depends on what you mean by the question.

      Q      Let me just go ahead and I will back up, make sure I understand correctly.  In that twenty percent of the time that you are actually working in the ER, you are probably along the same route, also supervising the residents that are there on staff with you that day in the emergency room?

      A      That's correct.

      Q      Is that a correct statement?

      A      That is a correct statement.

      Q      And then you talked earlier about how you are – and I know I'm not going to get the correct words – but how you have a lot of administrative duties having to do so with these forty-six residency programs.  And I guess I just want to understand that supervision or admin work has to do with kind of work outside of the ER then; correct?

      A      That is correct.

In arguing that Dr. Bartfield does not satisfy the "active clinical practice" requirement of Section 60-3412, defendant relies on Dr. Bartfield's testimony that twenty percent of his time is spent on "patient care."  It is not completely clear, however, what Dr. Bartfield meant by "patient care" – he did not define that term, and the questioner had

asked for a split between "patient care" and "administrative duties." Dr. Bartfield also described the eighty percent portion as "non-direct clinical work" at one point, while later describing it as "non-clinical" (though not all administrative). Dr. Bartfield included within that eighty percent "administrative, teaching, advising . . ., participating in administering examinations, writing board questions." Defendant argues that none of those activities may be considered "patient care" or "actual clinical practice" under Kansas law; the Court disagrees, however, as "advising" could include advice with respect to particular patients. Thus, Dr. Bartfield's deposition testimony is not sufficiently clear to answer the relevant question definitively.

Plaintiffs have also submitted an affidavit from Dr. Bartfield in opposition to the motion to strike. In the affidavit, Dr. Bartfield states as follows in relevant part:

> 3. At the time of my deposition, when asked what percentage of my professional time was spent on "actual clinical practice," I was of the understanding that "actual clinical practice only included direct patient care or care provided at a patient's bedside in which I was the attending physician of record.
>
> 4. I was unaware when asked about my time spent in "actual clinical practice" during deposition that I was to include those activities considered indirect patient care.
>
> 5. During my deposition, unaware of how Kansas law defines "actual clinical practice," I listed "non-direct patient care" as an administrative activity and did not include it in my consideration of how much of my time is spent in "actual clinical practice." Furthermore, opposing counsel referred to such care as "administrative" continuing my misunderstanding of the definition of indirect patient care.
>
> 6. When my activities considered indirect patient care are considered along with my work in direct patient care, more [than] 50% of my professional time is spent in actual clinical practice.

7

> 7.  Much of my indirect patient activities include overseeing the clinical training of and advising resident physicians. This work goes on to affect the patient care rendered by the resident physicians at Albany Medical Center.[3]

Defendant argues that the affidavit contradicts Dr. Bartfield's deposition testimony and thus should be rejected as a "sham affidavit." As noted above, however, the deposition testimony was not clear concerning the breakdown of Dr. Bartfield's activities, and the Court therefore will consider the affidavit.

The Court concludes, however, that the issue of Dr. Bartfield's compliance with Section 60-3412 remains unresolved. Dr. Bartfield states that when his "indirect patient care" is included, "actual clinical practice" makes up more than 50 percent of his professional time. It is true that "actual clinical care" and "patient care" for purposes of this statute could include "indirect" care, in the sense that the practitioner is not at the patient's bedside, but is instead advising concerning a patient's care from a distance. Dr. Bartfield has not fully explained what that care includes, however, and it appears that Dr. Bartfield may be including his work running the residency programs – which he appeared to describe in his deposition as a major focus of his work – within his definition of "indirect" patient care. For instance, in paragraph 7 of the affidavit, Dr. Bartfield refers to his oversight of residents as indirect patient care, as such work "goes on" – presumably in

---

[3] Dr. Bartfield also states that he is not a professional witness and that zero to ten percent of his professional time is devoted to medical legal matters in any given week. Plaintiffs note that the intent of Section 60-3412 is to prevent the use of professional witnesses. *See Dawson*, 276 Kan. at 375-76 (quoting *Wisker v. Hart*, 244 Kan. 36, 43-44 (1988)). Whether or not Dr. Bartfield could be called a professional witness, however, is not especially relevant, as the statute makes competency contingent only upon satisfaction of the 50-percent rule.

8

the future – to affect patient care rendered by those residents.  As discussed above, the Kansas appellate court cases indicate that teaching and research and administrative work that may benefit patient care generally but that is not intended to benefit particular patients does not constitute "actual clinical practice" under the statute.  Thus, plaintiffs have still not established that Dr. Bartfield's professional time satisfies the standard set out in Section 60-3412.

Because the viability of plaintiffs' claims turns on this issue, as noted below, the Court concludes that the issue is best determined after a hearing, at which Dr. Bartfield may provide additional testimony, in the nature of a voir dire of the witness, in which he describes in more detail how he spends his professional time.  The Court therefore retains the motion to strike under advisement, and it sets the motion for hearing on **December 7, 2020, at 1:00 p.m. CST, by videoconference**.

## II.     Summary Judgment Motion

### A.     *Lack of Expert Testimony*

The parties agree that each claim asserted by plaintiffs requires proof of defendant's breach of the applicable standard of care, including expert testimony.  Defendant argues that if plaintiffs' standard-of-care expert, Dr. Bartfield, is not permitted to testify, plaintiffs cannot meet their burden of proof.  Plaintiffs do not dispute that the survival of their case turns on the ruling on the motion to strike.  The motion to strike remains pending, however.  Accordingly, the Court retains under advisement this portion of defendant's summary judgment motion.

Defendant also seeks summary judgment based on its argument that plaintiffs cannot show but-for causation as a matter of law. Defendant argues that decedent's death could not have been caused by a failure to transfer him immediately to KU Medical Center when a bed there was requested, for the following reasons: surgery did not begin on decedent at KU until three hours after he was assigned a bed; according to plaintiffs' causation expert, decedent needed to receive surgery by 11:30 p.m. at the latest; thus, decedent would not have been saved by surgery even if he had been transferred when a bed at KU was requested at 8:27 p.m., based on a three-hour wait for surgery.

The Court summarily rejects this argument for summary judgment based on causation, which ordinarily presents a question of fact for the jury. Plaintiffs' causation expert has opined that defendant's acts caused harm to decedent. Moreover, plaintiffs' claims are broader than the mere allegation that defendant failed to complete the transfer to KU at 8:27 p.m.; rather, plaintiffs contend generally that defendant acted negligently in failing to appreciate the urgency of decedent's condition and to secure the proper treatment (from any medical center) in a timely fashion. Thus, defendant, in focusing only on a failure to complete the transfer to KU at a particular time, has failed to show the absence of a question of material fact as required for summary judgment. Accordingly, the Court denies defendant's request for summary judgment on this basis.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's motion to strike plaintiffs' expert and for summary judgment (Doc. # 71) is **denied in part and remains pending in part**. The summary judgment motion is denied to the extent based

on the issue of causation. The Court retains under advisement the motion to strike and the summary judgment motion to the extent based on a ruling on the motion to strike.

IT IS FURTHER ORDERD THAT the Court will conduct an evidentiary hearing on the motion to strike on **December 7, 2020, at 1:00 p.m. CST, by videoconference**.

IT IS SO ORDERED.

Dated this 24th day of November, 2020, in Kansas City, Kansas.

*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge